UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

SARA M. REED,                          )
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )          Case No. 2:10CV51 CDP
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
          Defendant.                   )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Sara Reed's application for supplemental

security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§

1381 *et seq.* and her application for disability insurance benefits under Title II of the

Social Security Act, 42 U.S.C. §§ 401 *et seq.*  Reed claims that she is disabled

because she suffers from bi-polar disorder, anxiety, substance dependence, and

paranoia.  The Administrative Law Judge concluded that Reed's limitations would

leave her disabled, but because Reed's substance abuse was a contributing factor

material to her disability, he concluded that she was not "disabled" under the

meaning of the Social Security Act.  Reed appeals the ALJ's decision and argues

that the ALJ did not give appropriate weight to the opinions of one of her treating

psychologists, Roy Kletti.  Because I conclude that the ALJ gave appropriate

weight to Kletti's opinions, I will affirm his decision.

Procedural History

Reed filed an application for disability insurance benefits on February 9, 2007 and filed an application for supplemental security income on March 31, 2007. Reed alleged that she had been disabled since October 1, 2004. Reed's applications were denied on August 16, 2007 and Reed sought review. The Administrative Law Judge held a hearing on September 17, 2009 at which Reed appeared and testified. The ALJ denied Reed's application for disability benefits on November 20, 2009. The Appeals Council of the Social Security Administration denied Reed's request for review of the ALJ's decision on June 24, 2010.

Testimony Before the ALJ

At the hearing on September 17, 2009, Reed stated that she was thirty-four years old, 5'4" tall, and weighed 130 pounds. She also stated that she was divorced and had two children, ages sixteen and seventeen, but that she lived alone. Reed completed ninth grade, but dropped out of high school before completing tenth grade. She passed the General Educational Development (GED) test in 1997 while she was incarcerated.

Reed was last employed in 2005. She had worked as a nursing assistant at various nursing homes from 1992 until 2005. She also worked at two fast food

restaurants in 2005, although she only worked at each of these restaurants for no more than a few weeks. Before 2005, she had worked as a cook, a general laborer at a boat factory, she moved boxes in a warehouse, and worked as an upholsterer. The reason generally given by Reed for leaving a job was that she "just started having anxieties at work."

Reed stated that she did not have any physical limitations, however, she testified that she had several mental limitations. One of Reed's most significant limitations is her dependency on drugs and alcohol. Reed primarily abuses alcohol, but has also abused marijuana, methamphetamine, benzodiazepine, and cocaine. Reed claimed that she had not consumed alcohol since January of 2008. However, the ALJ noted that she had tested positive for alcohol in February of 2008, when she was treated for a benzodiazepine overdose. When confronted with this contradiction at the hearing, Reed insisted that she had not consumed alcohol since January of 2008.

Reed also stated that she had been diagnosed as bi-polar and has been taking medication for this disorder and other mental issues since 2002. She also testified that she suffers from paranoia. Reed stated that her medication reduces her paranoia, but she continues to experience paranoia occasionally. As an example of how her paranoia affects her work, Reed explained that she became paranoid when

people around her were speaking on the phone, because she believed they were talking about her.  This would make her scared or angry and soon after experiencing this sort of paranoia, she would quit her job in order to avoid conflict.  Her paranoia has also affected her living situation.  She has faced consequences for damaging property after she "tore up the walls" of her home because she thought cameras had been hidden inside.

Reed also suffers from depression.  Reed testified that she has attempted suicide "three or four" times, but Reed stated that, with respect to her depression, she generally does not "really notice it, . . . .  I don't know, a few times a month I notice it."  She also has problems concentrating and with anxiety.  She has difficulty focusing while filling out paperwork and she is uncomfortable around other people.

The ALJ called a vocational expert, Gary Weimholt,[1] who had been provided with and reviewed Reed's file, including her past work history.  Weimholt testified that most of Reed's previous jobs involved unskilled work at the light physical demand level.  Weimholt testified that the skills she had learned in her employment would be limited to the same trade, business, industry, or occupation.  The ALJ described a hypothetical individual to Weimholt with the same education, training, and work experience as Reed, with no exertional limitations, and who could:

---

[1] The vocational expert's name is spelled "Wingholt" in the transcript of the hearing, however, in his CV, his name is spelled "Weimholt."

understand, remember, carry out at least simple instructions, and perform non-detailed tasks; demonstrate adequate judgment to make simple work related decisions; respond appropriately to supervisors, and co-workers; was task-oriented and had contacts with others as casual and infrequent; and could adapt to a routine and simple work changes, but would also have five absences per month. The ALJ then asked Weimholt whether this individual could perform any of Reed's previous jobs. Weimholt testified that she could not, because of the absences.

The ALJ then changed the hypothetical so that the person could maintain regular work attendance and that the person's drug and alcohol dependency was in remission. The ALJ asked Weimholt if this individual could perform any of Reed's previous jobs. Weimholt testified that this hypothetical individual "certainly" could perform all of Reed's past work, except Reed's work as a nursing assistant.

<u>Medical Records</u>

Reed provided approximately 500 pages of medical records. The bulk of her medical records were precipitated by incidents of alcohol and substance abuse and essentially all of her medical records that specifically reference her paranoia, depression, and anxiety also indicate some form of contemporaneous substance abuse.

One of the earliest available medical records, dated July 1, 2004, notes that Reed was treated after overdosing on drugs and alcohol.  The record indicates that Reed was anxious and depressed because she believed that her parole would soon be revoked.  She was diagnosed as suffering from alcohol dependence and a mood disorder – not otherwise specified.  On March 10, 2006, Reed was involuntarily hospitalized for a mood disorder during an attack of paranoia, agitation, and delusions.  Laboratory analysis indicated that she had tested positive for amphetamines.  Upon discharge, Dr. Fernando Perez noted that her Axis I diagnosis indicated that she suffered from a "[m]ood disorder NOS related to substance abuse with a history of alcohol dependence and cocaine dependence" and that Reed's Axis IV diagnoses was "[r]elated to her alcohol issues."  On September 3, 2006, Reed was admitted to the emergency department of Audrain Medical Center after overdosing on "mixed drugs, undetermined amount."  Reed's drug screen was positive for benzodiazepine.  The discharge diagnosis for this incident notes that Reed had a history of depression and anxiety.

This pattern of substance abuse intertwined with symptoms of depression and paranoia continues throughout the relevant time period.  On September 27, 2006, Reed was admitted to the emergency department of Audrain Medical Center after trying to detox from alcohol dependency on her own.  Reed claimed that she had

been drinking more than a fifth of a gallon of vodka per day for the previous month.

The record notes that the detox caused Reed to be depressed and to suffer tremors

and hallucinations.  Less than six months later, on February 7, 2007, Reed's parole

officer prompted her to admit herself to the CIMOR department of mental health to

receive treatment for her addiction to alcohol.  Upon admission, Reed noted that she

had a "great deal of time spent drinking the past years," and that her drinking had

impacted her employment and her personal life.  The assessor found that Reed did

not manifest any symptoms of anxiety, but Reed reported that she was depressed.

Ultimately, Reed did not complete the treatment.  She discharged herself on

February 15, 2007 after consuming alcohol to the point of intoxication three times

while admitted to the facility.  Upon discharge, her records reflect that she exhibited

paranoia and poor impulse control and would "likely benefit from further treatment

to manage psychiatric symptoms and alcoholism."

On December 1, 2007, Reed was admitted to Audrain Medical Center for

"acute alcohol and benzodiazepine intoxication with withdrawal."  On December

11, 2007, Reed returned to Audrain Medical Center in relation to withdrawal from

benzodiazepine and a recent overdose on benzodiazepine (Xanax).  Reed denied

abusing drugs at that time, however, her drug screen was positive for

benzodiazepine and she admitted to "some rather heavy benzodiazepine use about

two days prior to this admission."  Approximately two weeks later, Reed returned to the Medical Center after overdosing on Xanax.  During this incident, Reed was treated by Dr. Jennifer Brockman.  Dr. Brockman noted that Reed was confused and had poor insight and judgment when she arrived at the facility.  However, after a few days of proper medication and counseling, Dr. Brockman noted that Reed was "clearly" able "to participate in the unit and did not appear to be anxious or have any problems while she was [at the facility] and not taking pain medication and Benzodiazepines."  In addition, once Reed was free of the influence of drugs and alcohol, she was alert and oriented, her affect was congruent, and Reed "had insight and judgment into the terms of her mood disorder, her problems, and her need for follow-up."  Dr. Brockman's Discharge Diagnosis is similar to the majority of the diagnoses Reed had previously received.  It stated: "Axis I Major depressive disorder, alcohol and Benzodiazepine dependency."[2]

This pattern continued until the hearing with the ALJ.  On January 5, 2008, Reed was admitted to the Audrain Medical Center for acute alcohol intoxication with withdrawal.  A month later, on February 6, 2008, Reed was admitted to Audrain Medical Center after an alcohol and drug overdose.  On April 4, 2008, Dr.

---

[2] Dr. Brockman's report also includes a description of an incident in which Reed appears to have used the facility's phone to order an unauthorized prescription for the drugs Soma and Thalium from a nearby pharmacy.  By the time the staff discovered what Reed had done, she had already left the facility, however, they were able to put a hold on all of her prescriptions until she saw a psychiatrist.

Quinlan, who had been treating Reed for gastrointestinal problems noted that she had recently completed thirty days in an alcohol dependence treatment facility and that she was not currently drinking. However, a few weeks after completing this treatment, on April 23, 2008, Reed was again admitted to the Audrain Medical Center after overdosing on benzodiazepines. On June 24, 2009, Dr. Quinlan noted in her records that Reed refused to visit her psychiatrist because he would not prescribe her benzodiazepines. The record also includes a series of blood tests showing that Reed tested positive for drugs or alcohol on February 6 and 7, 2008, April 23, 2008, and February 19, 2009.

Reed's longest treatment relationship was with her psychiatrist, Dr. John Hall. Dr. Hall treated Reed from December of 2004 until April of 2008, however, Reed visited Dr. Hall only infrequently during the later part of their relationship – between June of 2007 and April 2008. Dr. Hall's records reflect a connection between Reed's substance abuse and her other mental issues.

On December 20, 2004, Dr. Hall met with Reed after she had been released from serving 120 days in the Audrain County jail. Hall observed that Reed was depressed and experienced paranoia. Hall met with Reed again on January 10, 2005, during a period in which the record does not reflect that Reed was abusing drugs or alcohol. During that visit, Hall noted that Reed appeared calm, alert, and

"not as anxious." Hall did not observe any evidence of paranoia. Hall met with

Reed again on February 5, 2005. Again Reed did not exhibit any signs of paranoia,

but her mood was still depressed and she "felt like drinking again." Hall did not see

Reed again until May 27, 2005. At that visit he noted that she exhibited some

"panic & anxiety," but that her mood was "ok." On July 26, 2005, Reed indicated

that she had relapsed since her last visit and used drugs or alcohol. Hall observed

that her mood was "down" and her affect was "bored, sad." Between July and

November of 2005, Dr. Hall's records indicate that Reed had enrolled in vocational

rehab and had largely abstained from alcohol. Consequently, on November, 28,

2005, Hall noted that Reed's "anxiety is better" and that her "mood is better."

(underline in original). Hall's March 28, 2006 record reflects Reed's March

hospitalization, during which she tested positive for amphetamines. On April 18,

2006, Reed's mood is again listed as "down." After her September, 2006 treatment

for overdosing on benzodiazepine's, Reed's mood was again "down" and she was

anxious or agitated. Hall provided Reed with letters stating that her "bipolar

disorder and anxiety as well as Attention Deficit Disorder . . . render her unable to

maintain gainful employment" and that Reed "is diagnosed with Bipolar Disorder

with Social Anxiety."

　　　　In addition to these treatment documents, the record also includes

assessments of Reed's ability to work by two psychologists.  Reed was assessed on

July 31, 2007 by Patrick Finder, a licensed psychologist.  Finder observed that Reed

was anxious, depressed, and paranoid.  Finder's Axis I diagnosis of Reed was

"Bipolar Disorder I, by history, polysubstance dependence in early full remission,

Adult Anti-social behavior."  Finder ruled out an Axis I diagnoses of Schizophrenic

disorder.  During this assessment, Reed described experiencing a degree of paranoia

that is not reflected elsewhere in the record.  Reed expressed fears that people were

tampering with her garden and her groceries and that there were recording devices

hidden in the wall.  Finder stated that Reed's paranoia "traces back to her

methamphetamine use in the early 2000s and [Finder] could not rule out the

possibility that her current schizophrenic symptoms are due to extensive

amphetamine use."  Finder also noted that it appeared Reed had sores on her face

consistent with methamphetamine use, although Reed denied using

methamphetamine or any other drugs at that time.

September 14, 2009, Roy Kletti, a licensed psychologist, examined Reed and

completed a "Medical Assessment of Ability to do Work-Related Activities."  The

assessment was based on an examination of Reed's mental and emotional

capabilities.  This document is a two-page form that Kletti completed by making

checkmarks on a series of pre-designated lines.  The assessment does not provide

any recommendations on methods of treating Reed and does not indicate whether Kletti's opinion of Reed's work-related abilities took into account her continuing substance abuse issues.  In addition, on September 23, 2009, Kletti responded to a letter sent by Reed's attorney asking whether Kletti believed that Reed was credible when she claimed that she had not used drugs or alcohol since January of 2008. Kletti responded by writing in the margin of the letter that, based on a review of his records,  neither he nor his staff had suspected Reed of using drugs or alcohol since January of 2008.

<u>Legal Standard</u>

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a

court considers both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

    (1)    the credibility findings made by the Administrative Law Judge;

    (2)    the education, background, work history, and age of the claimant;

    (3)    the medical evidence from treating and consulting physicians;

    (4)    the plaintiff's subjective complaints relating to exertional and non-exertional impairments; and

    (5)    any corroboration by third parties of the plaintiff's impairments; and

    (6)    the testimony of vocational experts when required which is based on a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. § 416(i)(l); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§

404.1505(a) and 416.905(a).  In determining whether a claimant is disabled, the

Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant engages in substantial

gainful activity.  If the claimant is engaging in substantial gainful activity, he is not

disabled.

Next, the Commissioner determines if the claimant has a severe impairment

which significantly limits the claimant's physical or mental ability to do basic work

activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether

the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the

Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current

work activity or medical facts alone, and the claimant has a severe impairment, the

Commissioner reviews whether the claimant can perform his past relevant work.  If

the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner

must evaluate whether the claimant can perform other work in the national

economy.  If not, the Commissioner declares the claimant disabled.  20 C.F.R. §§ 404.1520 and 416.920.

When evaluating evidence of subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984), which include:

claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;

2. the duration, frequency, and intensity of the pain;

3. precipitating and aggravating factors;

4. dosage, effectiveness and side effects of medication;

5. functional restrictions.

*Id.* at 1322.

However, even if an applicant would otherwise qualify as disabled, an

"individual shall not be considered disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. 423(d)(2)(C) (regarding disability insurance benefits); *see also* 42 U.S.C. 1382c(a)(3)(J) (regarding supplemental security income). "In the case of alcoholism and drug addiction, an ALJ must first determine if a claimant's symptoms, regardless of cause, constitute disability." *Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). "If the ALJ finds a disability and evidence of substance abuse, the next step is to determine whether those disabilities would exist in the absence of the substance abuse." *Id.* "When a claimant is actively abusing drugs, this inquiry is necessarily hypothetical, and thus more difficult than if the claimant had stopped." *Id.* "The claimant has the burden to prove that alcoholism or drug addiction is not a contributing factor." *Id.*

<u>The ALJ's Findings</u>

The ALJ found that Reed does not suffer from a disability within the meaning of the Social Security Act at any time through the date of his decision because substance abuse is a contributing factor material to her disability. He issued the following specific findings:

    1.    Reed met the insured status requirements of the Social Security Act through December 31, 2005.

-16-

2.     Reed had not engaged in substantial gainful activity since the alleged onset date of her disability, October 1, 2004.  20 C.F.R. § 404.1520(b), 404.1571 *et seq.*, 416.920(b), 416.971 *et seq.*

3.     Reed had the following severe impairments: bipolar disorder by history; adult anti-social behavior; and polysubstance dependence.  20 C.F.R. § 404.1520(c), 416.920(c).

4.     Reed did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(d) and 416.920(d).  The ALJ noted that he had carefully considered Sections 12.04, 12.08, and 12.09 of the Listing of Impairments.

5.     After carefully considering the entire record, the ALJ found that, based on all of the impairments, including the substance abuse disorders, Reed had the residual functional capacity to perform a full range of work at all exertional levels.  However, Reed had non-exertional limitations.  She was able to understand, remember, and carry out at least simple instructions and non-detailed work; demonstrate adequate judgment to make simple work-related decisions; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; and adapt to routine/simple work changes.  The ALJ also found that Reed would likely have up to five absences per month.

6.     Reed was unable to perform any past relevant work.  20 C.F.R. § 404.1565, 416.965.

7.     Reed was born on January 16, 1975 and was 29 years old, therefore, on the alleged onset date, Reed was defined as a younger individual, age 18-49.  20 C.F.R. § 404.1563, 416.963.

8.     Reed had at least a high school education and was able to communicate in English.  20 C.F.R. § 404.1564, 416.964.

9.     Reed's acquired job skills did not transfer to other occupations within the residual functional capacity previously described.  20 C.F.R. § 404.1568, 416.968.

10.     Considering Reed's age, education, work experience, and residual functional capacity based on all of the impairments, including the substance use disorders, there were no jobs that existed in significant numbers in the national economy that the claimant could perform.  20 C.F.R. §404.1560(c), 404.1566, 416.960(c), 416.966.

11.     If Reed stopped substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities.  Therefore, the claimant would continue to have a severe impairment or combination of impairments.

12.     If Reed stopped the substance use, she would not have an impairment or combination of impairments that meets or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(d), 416.920(d).

13.     If Reed stopped substance use, she would have the residual functional capacity to perform a full range of work at all exertional levels.  However, Reed had non-exertional limitations.  She was able to understand, remember, and carry out at least simple instructions and non-detailed tasks; perform repetitive work according to set procedures, sequence or pace; maintain regular attendance and work presence without special supervision; and perform some complex tasks.

14.     Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Reed was "not disabled" whether or not she had transferable job skills.  *See* SSR 82-41; 20 C.F.R. Part 404, Subpart P, Appendix 2.

15.     If Reed stopped substance use, considering her age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the

claimant could perform. 20 C.F.R. § 404.1560(c), 404.1566, 416.960(c), 416.966.

16. Because Reed would not be disabled if she stopped the substance use, 20 C.F.R. § 404.1520(g), 416.920(g), her substance use disorders were a contributing factor material to the determination of disability, 20 C.F.R. § 404.1535, 416.935. Thus, Reed had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of the ALJ's decision.

The ALJ concluded that, although there were no jobs in the national economy that Reed could perform, Reed did not qualify for disability under the Social Security Act because substance abuse is a contributing factor material to her disability. In making this determination, the ALJ gave substantial weight to the findings and opinions of Reed's treating and examining physicians. However, the ALJ gave little weight to the opinion of Roy Kletti, a licensed psychologist. The ALJ considered Kletti's opinion, but noted that it did not consider whether Reed's limitations were affected by substance abuse and that it was contradicted by the record as a whole. The ALJ also discounted Kletti's opinion that Reed had not used alcohol or drugs since January of 2008, because this opinion was directly contradicted by several other medical records. After considering the testimony provided at the hearing and reviewing the medical records, the ALJ found that Reed would not suffer from the limitations that prevented her from working, if she ceased abusing drugs and alcohol.

<u>Discussion</u>

When reviewing a denial of Social Security benefits, a court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones ex rel. Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court's task is a narrow one: to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g); *Estes v. Barnhard*, 275 F.3d 722, 724 (8th Cir. 2002). Here, Reed argues only that the ALJ did not give proper weight to the opinion of Roy Kletti, who, Reed asserts, is a treating source under the regulations. I disagree.

Even assuming that Kletti qualifies as a treating source under the regulations, the ALJ did not give inappropriate weight to Kletti's opinions. The weight given to the opinion of a treating source depends on the length, nature, and extent of the treatment relationship. 20 C.F.R. § 404.1527 (d)(2)(i), (ii). A treating source's opinion may be discounted if it is supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (internal citations omitted).

The record indicates that Kletti had a minimal treatment relationship with Reed and, to the extent that his opinions conflict with the ALJ's conclusion, his opinions are not supported by the record. The record shows that Kletti examined Reed a single time. Kletti's examination consisted of completing a fill-in-the-blank form assessing Reed's ability to perform work-related activities. Although this form indicated that Reed had a very limited ability to engage in work-related activities it did not indicate whether or not Kletti considered Reed's work-related abilities in the absence of substance abuse. Therefore, Kletti's opinion on this form does not explicitly contradict the ALJ's conclusion that Reed's substance abuse was a contributing factor material to her disability.

In addition, to the extent that this opinion could imply that Reed would have been disabled, even in the absence of substance abuse, it is inconsistent with the record. Virtually all of Reed's complaints of depression, anxiety, or paranoia arose in the context of drug or alcohol abuse. Furthermore, according to the records of Doctors Hall and Brockman, Reed experienced less anxiety and depression when she abstained from drugs and alcohol. As a result, if Kletti's opinion is that Reed would suffer the same mental limitations if she did not abuse drugs or alcohol, it is contradicted by the overwhelming majority of the records in Reed's medical history.

Similarly, the ALJ gave Kletti's opinion regarding the last date on which Reed used drugs or alcohol appropriate weight. Kletti's opinion on this issue was provided without examining or questioning Reed and it is contradicted by medical records dated February and April of 2008 and February of 2009, in which Reed tested positive for drug or alcohol use. Therefore, even if Kletti's opinion is entitled to the weight of a treating source, the ALJ did not err by failing to give this opinion controlling weight because it is contracted by more thorough medical evidence.

The ALJ also did not ignore Kletti's opinion, as Reed implies in her brief. Regardless of whether the ALJ grants a treating source's opinion substantial weight, the ALJ must "always give good reasons" for the weight given to a treating source's evaluation. 20 C.F.R § 404.1527(d)(2). In his opinion, the ALJ explicitly addressed each record attributed to Kletti and gave specific reasons why he did not believe that Kletti's opinions were persuasive.[3] Consequently, the implication that the ALJ simply ignored Kletti's opinion is not supported by the record.

Finally, the record as a whole supports the ALJ's decision. The record shows that Reed has largely failed to maintain sobriety for any significant period of time.

[3] The ALJ also discusses a record dated July 30, 2009 from the Arthur Center that he attributes to Kletti. This record, however, does not appear to be in Kletti's handwriting and appears to be signed by someone other than Kletti. Since there is no other indication on the document that Kletti participated in its completion, I find it doubtful that Kletti actually participated in the preparation of this record. However, even if Kletti had prepared this record, it does not contradict the ALJ's conclusion because it does not assert that Reed's mental limitations are independent from her substance dependency.

Nearly every medical record in Reed's file that notes Reed's paranoia, anxiety, or depression also notes some form of substance abuse at approximately the same time. The records provided by two of Reed's treating physicians indicate that her mental limitations were alleviated when she abstained from drugs and alcohol for even a short period of time. In contrast, there are no records explicitly stating that Reed's mental limitations are unrelated to her substance abuse. Therefore, as a whole, these facts support the ALJ's finding that Reed's substance abuse contributes to her mental limitations.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed. A separate judgment in accordance with this Memorandum and Order is entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 20th day of June, 2011.